(72 South. 455)

No. 20625.

WILLIAMS v. DOUGLAS.

(June 30, 1916.)

*(Syllabus by the Court.)*

1. EXECUTORS AND ADMINISTRATORS ⬤⟳221(9) — SUCCESSION — ACTIONS — SUFFICIENCY OF EVIDENCE.

In a suit against a succession on promissory notes written by the plaintiff and apparently written after the deceased had signed her name, the only evidence that she received a consideration for the notes being the testimony of the plaintiff that he handed it to her in cash, and the proof being that the deceased was a woman of economical habits and of modest wants and that her intimate and constant companions had no knowledge of her having spent or had the money, it is *held*, that there is not sufficient proof that the deceased received a consideration for the notes.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 903½, 1874, 1876; Dec. Dig. ⬤⟳221(9).]

2. HUSBAND AND WIFE ⬤⟳21 — CONTRACTS WITH THIRD PERSONS — AUTHORIZATION BY HUSBAND.

As the authorization of the husband that is required for a married woman to obligate herself must refer to the particular contract, a letter written by the husband to the family physician, inquiring whether the latter could loan the wife enough money for a particular purpose, is not sufficient authorization for the wife to sign, without the husband's knowledge, promissory notes for a sum largely in excess of the loan contemplated by the husband.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 139, 141; Dec. Dig. ⬤⟳ 21.]

Appeal from Twenty-Fourth Judicial District Court, Parish of East Feliciana; Jos. L. Golsan, Judge.

Action by L. Williams against Margaret

Douglas, executor. From a judgment for defendant, plaintiff appeals. Affirmed.

Purser & Magruder, of Amite City, and Kilbourne & Walker, of Clinton, for appellant. H. H. Kilbourne, of Clinton, and Boliver E. Kemp, of Amite City, for appellee.

O'NIELL, J. The plaintiff appeals from a judgment dismissing his suit on three promissory notes and a receipt or duebill, supposed to have been signed by the deceased, Mrs. Mattie Williams Viers.

In answer to the suit, the executrix denied that the instruments were signed by Mrs. Viers. In the alternative, she alleged that Mrs. Viers had not received any consideration whatever for issuing the instruments sued on; and, again in the alternative, she alleged that, if the instruments were signed by Mrs. Viers, her signature was secured by fraud and undue influence; and that, in any event, Mrs. Viers was the wife of John W. Viers at the date of the instruments sued on, and, if they were signed by her, they were invalid because her husband did not authorize her to sign them.

One of the notes is for $5,500, dated at Grangeville, La., February 4, 1910, and payable on demand, at the Teutonia Bank; another is for $350, dated February 6, 1911, but is not payable at any specified date nor on demand; and the third is for $1,200, dated at Grangeville, La., the 6th of March, 1911, and payable one year after date, at the office of the plaintiff, in New Orleans. The receipt is for $30 and is dated in New Orleans, the 6th of February, 1911.

All of the instruments were written by the plaintiff and bear what purports to be the signature of Mrs. Mattie Viers. The note for $1,200 is written on a sheet of paper bearing the letter head of the husband of Mrs. Viers, "John W. Viers, Amite River Plantation, Grangeville, La." The other three documents are written on blank sheets of paper. The shade of ink with which the signatures were written is different from the shade of the ink in the body of the instrument. The body of the note for $1,200 appears to have been written after the signature was made on the paper, and this is also true of the note for $350. The last three lines were cramped together in an apparent effort to complete the writing above the signature. The upper parts of the letters in the signature encroach upon the body of the instrument, notwithstanding there was ample room below for the signature. The signature on the note for $5,500 is spaced almost equidistant from the right and left edges of the paper, and is written as if for the purpose of giving the name and address, thus:

(Mrs.) Mattie Williams Viers,
Grangeville,
La.

The signature on the other three documents is in the lower left corner of the paper.

Mrs. Viers, who was very ill continuously for many years before the date of these instruments, resided on her farm, a mile and a half from Grangeville. The household consisted of Mr. and Mrs. Viers and Miss Martha McKinzie, who was the confidential companion of Mrs. Viers for about 31 years.

The plaintiff was a practicing physician in New Orleans, and Mrs. Viers became acquainted with him professionally in the early part of the year 1908; after which his relations with Mr. and Mrs. Viers became very friendly, and he was a frequent visitor to their farm until she died.

[1] The only evidence that Mrs. Viers received any consideration for the instruments sued on is the testimony of the plaintiff himself, who swore that he delivered the money to her in cash. As to the note of $5,500 dated the 4th of February, 1910, the plaintiff testified that Mrs. Viers called at his office in New Orleans some time before the

signing of that note and borrowed $4,000 from him, giving her note for that amount; that he got the money in cash from his private bank box and paid it to her in his office; that no one witnessed the transaction except himself and Mrs. Viers; and that, a month before that note became due, Mrs. Viers said she was unable to pay it and desired to borrow more money. The plaintiff says that he then told Mrs. Viers that he understood that it was necessary for her to have a power of attorney from her husband; that he called at her home on the farm to loan her an additional sum of money, but that she was not at home; that he wrote out the note of $5,500 and left it with Miss McKinzie, with a letter explaining to Mrs. Viers that she might call at his office in New Orleans and get the balance of $1,855. He does not explain why he was to let Mrs. Viers have $1,855 in addition to the $4,000 he had already loaned her. He says that, deducting the interest from the $4,000 she owed, it required $1,180, or $1,190, which he paid her in cash, to make up the amount of $5,500, for which she signed the note written by him.

He testified that the payment of the $1,-180, or $1,190, and the signing of the note for $5,500, took place at his office in New Orleans; that he paid the money to her in cash; and that no one except himself and Mrs. Viers witnessed the transaction.

With regard to the note for $350 dated the 6th of February, 1911, the plaintiff testified that he took that amount of money in cash to the home of Mrs. Viers on the farm for the purpose of loaning it to her; that he wrote the note and she signed it; and that there was no witness to the transaction except himself and Mrs. Viers. When his attention was called to the fact that he had written at the end of the note, "dated New Orleans, La., February 6, 1911," he insisted that the note was written at Grangeville, and admitted that he could not explain why he had written that it was dated at New Orleans.

With regard to the note for $1,200 dated the 6th of March, 1911, the plaintiff testified that he carried that amount of money in cash in his pocket out to the home of Mrs. Viers on the farm and paid it to her when she signed the note. Before examining the note, while on the witness stand, however, he could not remember whether the note was signed at the farm or in his office in New Orleans. He testified that no one was present except himself and Mrs. Viers during the transaction.

As to the receipt for $30, the plaintiff testified that, during one of his visits to the farm, Mrs. Viers asked him to loan her $50; and, having only $30 to spare, he loaned it to her and she gave her receipt for the amount. He says that no one else was present or witnessed the transaction, and that the money was paid in cash.

Mrs. Viers died at her home on the farm on the 19th of July, 1911. J. W. Viers wrote a letter to the plaintiff two days later, apprising him of Mrs. Viers' death. Thereafter the plaintiff visited Mr. Viers at the farm, but did not mention the notes he held nor inform Mr. Viers that the succession was indebted to him, the plaintiff. Five days later—that is, on the 26th of July, 1911—the plaintiff wrote to Mr. Viers from Kentwood, La., expressing his thanks for the kindness shown him by Mr. Viers and Miss McKinzie during his visit on the farm, and proceeding as follows, viz.:

"Now, my dear friend, I intended speaking to you yesterday concerning several loans made by me to your wife, from Feb'y 4th, 1910, to the 10th of this month. No doubt you are aware of all loans except the one of July the 10th, which is only thirty dollars. However, seeing that you are at present in no condition to talk about financial matters and feeling satisfied that you will protect my interest at the proper time, decided not to open any conversation with you on that subject. I therefore thought of writing a few lines to you, stating the exact amount

due me from her estate (less interest): Feb'y 4th, 1910, I advanced Mrs. Viers on her personal note fifty-five hundred dollars ($5,500); Feb'y 6, 1911, I advanced Mrs. Viers on her personal note three hundred and fifty dollars ($350); March 6, 1911, I advanced Mrs. Viers on her note twelve hundred dollars ($1,200); July 10, 1911, I gave Mrs. Viers on a duebill, as a loan, thirty dollars ($30); making the total amount due me (less interest) seven thousand and eighty dollars ($7,080). I suppose Mrs. Viers left a will and you will soon open the succession, and if you will let me know who your attorney will be I will get my attorney to submit all the necessary papers to him.

"Now, my dear friend, do not worry about anything. I will be with you and stand by you and assist you in every way I can. I will be in N. O. about next Monday, and will send you the $250 as per your request, and will enclose a note for you to sign for a term of six months or longer if you like, and send it to my P. O. Box 699, N. O., La. Again thanking you for your kindness, I remain, your friend, Dr. L. Williams."

Mr. Viers admits that when the plaintiff visited the farm, after the death of Mrs. Viers, he asked the plaintiff to loan him $250 to assist in paying the funeral expenses.

In response to the letter from the plaintiff, dated the 26th of July, 1911, Mr. Viers, wrote:

"My Good Friend: I am bewildered, yes, worse, confounded. Had you hauled a rapid-fire Gatlin gun in front of my house and leveled it to the ground, I would not be more surprised than at the contents of your letter. I paid her board, $5 per week, and her Dr. and drug bills, and never knew my wife owed you a $. She wanted, some months ago, to go to the mountains, and I tried to sell some land to raise the money. She told me you would let her have $400 or $500, if I would authorize it. On her return, told me you refused to let her have any money. This is the puzzle to me; why she should deceive me? Now, my good friend, I don't want to wrong any living man, much less a friend. I never saw any evidence of this money. I feel sure if you will investigate you will find the money on deposit in some of the N. O. banks. She had a horror of being sick, and very much feared that my capacity could not supply her sufficient to pay Dr. and board bills, car fare, etc. There is not a garment or pair of shoes to show for it. She did not spend the money, and we must find it; only $30 in the house here. You may rest assured I will never wrong you. Your distressed and surprised friend, J. W. Viers."

Mr. Viers and Miss McKinzie testified that Mrs. Viers had never told either of them that she had borrowed any money from the plaintiff, and that they had never seen any evidence of her having had much money at any time. The evidence is, and it is not contradicted, that she was extremely economical, dressed very plainly, stopped at a cheap boarding house when she visited New Orleans to see Dr. Williams, never spent a dollar unnecessarily, and grieved over what little her illness was costing her husband. The investigation as to what had become of the large amount the plaintiff is supposed to have loaned her revealed nothing. She had authority to draw on the commission merchant with whom her husband dealt in New Orleans, and drew small sums for her personal needs, ranging from $25 to $100.

The correspondence between the plaintiff and Mrs. Viers, and the correspondence between him and Mr. Viers, discloses that Mr. and Mrs. Viers were an affectionate couple, who shared the troubles of one another; and there is not the slightest reason why Mrs. Viers should have kept any financial transaction a secret from her husband. The evidence also discloses that Mrs. Viers made a confidant of Miss McKinzie during the 31 years they lived together, and no reason is suggested why she should have kept any financial dealing with the plaintiff a secret from Miss McKinzie. The relations between Mrs. Viers and the executrix were close and confidential during the 15 years preceding Mrs. Viers' death. When she visited New Orleans, Mrs. Viers sometimes stayed at the home of the executrix, and at other times stopped at a cheap boarding house near her doctor's office; but she always visited the executrix on her visits to New Orleans. The executrix testified that Mrs. Viers made a confidant of her, but that she did not tell her of having borrowed any money from the plaintiff.

At the beginning of the cross-examination of the plaintiff, he said that he did not re-

member or did not know whether Mr. Viers was present when the note of $5,500 was signed, but that he might have been present; and that Mr. Viers knew his wife had signed the note, because she had told the plaintiff that her husband knew it. The cross-examination on this subject was as follows, viz.:

Q. (Was) Mr. Viers present when that note was signed?
A. I don't know, he might.
Q. (Did) Mr. Viers know anything about it?
A. She told me he did.
Q. She told you?
A. She told me.

Further on, in the cross-examination, the plaintiff volunteered the statement:

"Mrs. Viers was always hard up, and she told me Mr. Viers should not know anything."

Then he was questioned and answered as follows, viz.:

Q. Was Mr. Viers very much outraged when he heard of these notes the first time?
A. Oh, yes sir; he was furious. * * *
Q. You say Mr. Viers was very much outraged when he heard of your claim against Mrs. Viers?
A. He said he didn't know she borrowed.
Q. Why did you keep it a secret?
A. Because I was asked to do so by Mrs. Viers.
Q. Did you think that the proper thing to do?
A. Well, I thought I had the power of attorney from her husband. She told me not to worry; and whenever I came down there they were so nice to me; and if Mrs. Viers was alive to-day this thing would never have happened; they were as nice people as I would want to meet; and to-day I don't know why he objects to it.

The plaintiff admitted, in his testimony, that Mrs. Viers did not return any of the money she is supposed to have borrowed from him, in payment for professional services. His testimony on this subject is rather unsatisfactory, in that he first testified that he had not charged her anything for prescriptions, and thereafter said that she had paid him for the prescriptions before she borrowed from him.

The plaintiff's explanation as to why he paid such large sums of money to Mrs. Viers

in cash, instead of giving her checks on a bank, is not at all convincing nor satisfactory. The explanation was that he had kept an account subject to check in the Hibernia Bank in New Orleans; but that when he presented a check there for $750 one Saturday, in 1898, and the bank officials first declined to cash the check, but, on his insisting, did cash it, he became angry and drew out his balance and placed it in a safety deposit vault in another bank. If the check was presented Saturday afternoon, when the bank was closed, the unwillingness of the paying teller to cash the check was no excuse for the plaintiff to become angry or withdraw his deposit from the bank. The plaintiff does not contend, and we cannot assume, that the paying teller did not have a good reason for his unwillingness to honor the check. The plaintiff testified that, after his unpleasantness at the Hibernia Bank, he kept only small accounts subject to check in two other banks, and that he kept large sums of money in a private bank box.

He does not explain why he did not require mortgage security from Mrs. Viers. He admits that there was only a small mortgage on her farm, and that he considered it worth far more than the amount due him. Nor does he explain how it so happened that there was never any one except himself and Mrs. Viers present during any of the transactions in which he paid her sums of money that were extraordinary for a woman of her habits and wants.

His testimony as to where he got the money that he says he paid to Mrs. Viers is unsatisfactory, in view of the proof that he was unable to pay, and was sued for, his personal obligations; and judgments were rendered against him at that time. The medicine company of which he was president was also in need of money, and was sued by one of its stockholders for $2,000, about the time the plaintiff claims he was lending

money to Mrs. Viers instead of helping his company in its troubles.

Some of the letters written by Mrs. Viers to the plaintiff indicate that perhaps she did borrow some money from him; but they do not refer particularly to the notes or the receipt sued on, and our conclusion is that she was not indebted to him when she died.

We are convinced by the evidence in this case that Mrs. Viers did not receive the sums mentioned in the instruments sued on, and that she did not intentionally or knowingly sign or issue the instruments.

[2] The notes and receipt sued on were not signed by J. W. Viers to authorize his wife. The plaintiff's counsel contend, however, that the letter referred to by the plaintiff in his testimony as a power of attorney from Mr. Viers was sufficient authority at least for the signing of the note of $1,200 dated the 6th of March, 1911. The letter is not dated and is as follows, viz.:

"Dr. L. Williams, New Orleans—Dear Dr.: My wife is anxious to go to the Mts. and really I am short of funds. If you can furnish the necessary funds, and take any property we have (real estate) as collateral, I would be glad (if) you would accommodate her; only make the payment so that I can meet it. Sincerely your friend, Jno. W. Viers."

Mr. Viers testified that the letter was written about two months before his wife died; that the doctor had advised her to go to the mountains; that he had only $100 or $150, and desired to borrow only the difference between that sum and the cost of a trip to North Carolina; that his wife went to New Orleans, and he intended that, if she borrowed the money, a mortgage would be given for the amount; that a few weeks later she returned home, saying that Dr. Williams would not let her have the money but would lend it to him; that he urged her to go to the mountains with the money he had, saying he would send her more as she needed it, but she grew worse and died without having gone to the mountains.

Our opinion is that the undated letter written by Mr. Viers to the plaintiff, quoted above, is not evidence that Mr. Viers authorized his wife to sign any of the instruments sued on.

The plaintiff's counsel contend that, having denied the signature of Mrs. Viers, the executrix could not make any other defense to this suit. They rely upon article 326 of the Code of Practice, to the effect that the defendant who denies his signature in a suit on a written instrument is barred from making any other defense. In the case of Bradford et al. v. Cooper, Administratrix, 1 La. Ann. 325, it was said that the provisions of article 326 of the Code of Practice are founded upon the supposition that every one must know his own signature, which does not apply to an administrator or executor, who may not know the signature. And, in the case of Bayly & Pond v. Givens, 29 La. Ann. 546, it was held that article 326 of the Code of Practice applies only to a case where the instrument sued on purports to be signed by the defendant himself, and has no application to a case where the instrument purports to be signed by one assuming to be the agent of the defendant. Again, in the case of Mutual National Bank v. Richardson et al., 33 La. Ann. 1312, it was held that the rule established in article 326 of the Code of Practice, depriving a defendant who has denied his signature of the right to any other defense, does not apply to a partner who denies the firm's signature purporting to be made by another partner. The foregoing decisions were referred to with approval in State v. Hendricks & Jameson, 40 La. Ann. 719, 5 South. 24, 177, a proceeding against a surety on a bail bond.

Our conclusion is that the judgment appealed from is correct.

For the reasons assigned, the judgment appealed from is affirmed at the cost of the plaintiff, appellant.